## HUNT VS. MCFADGEN.

On a petition for confirmation of tax title, the collector's deed, not appearing upon its face to be void, and reciting that the owner of the land was a non-resident of the county at the time the land was assessed for taxes, must be regarded as *prima facie* evidence of that fact, and the burthen of proving that he was not a non-resident of the county at the time, is upon him.

A collector has no legal right to receive Tennessee bank paper in payment of taxes, and where lands have been advertised for sale, a tender, to make it effectual to stop the sale, must be for the whole of the taxes, penalty and costs.

Where a party bids off a part of a tract of land at a collector's sale for taxes, but refuses to pay the taxes, etc., and the collector subsequently re-offers the land, under the statute, and the same person purchases the same quantity of the land for the taxes, etc., the purchase will not be set aside for that reason, as his failure to comply with his bid at the first sale worked no injury to the owner; but if he bid off a larger quantity of land for the taxes, etc., his failure to comply with the bid at the first sale, and purchasing at the second sale cannot be regarded otherwise than as a fraud upon the rights of the owner, and a court of equity will not sanction and confirm his purchase under such circumstances.

Though a person become a resident of the county *after the first day of January*, his personal property is subject to assessment.

*Appeal from the Circuit Court of Prairie county.*

Hon. FELIX I. BATSON, Circuit Judge, presiding.

WILLIAMS & WILLIAMS, for the appellant.

The collector's deed is evidence of the authority under which said sale was made, the description of the land, and the price at which it was purchased, and the "authority under which said sale was made," goes the full extent of making out a *prima facie* case for petitioner, by the production of the deed itself, not only as to the official character of the officer, but as to all his pre-requisite acts, without which he would have no *authority.* See *Digest ch.* 160; *Steadman vs. Planter's Bank,* 2 *Eng.* 426; *Overman vs. Parker,* 18 *How.* 141, *and Hempstead's Rep.* 692. In the last case it was thought necessary to be decided that the deed *only* made a *prima facie* case in this proceeding, subject to be *rebutted by proof.* See, also, *sec.* 112, *ch.* 139 *Dig.,* where it is made (not its recitals, but its existence as a deed,) evidence of the regularity and legality of the sale of lands, subject, however, to be impeached by evidence upon the part of the defendant.

Now it seems manifest, from the provisions of the statute, that the Legislature intended to make the deed evidence of everything in all courts of law and equity, and to do so more effectually enacted the 113th section, requiring a fair and liberal interpretation of the intention of the Legislature. And in accordance with the spirit of this legislation are the cases of *Black vs. Percifield,* 1 *Ark.* 472; *Evans vs. Black and Percifield,* 5 *Ark.* 424; *Steadman vs. Planter's Bank,* 2 *Eng.* 424; *Pillow vs. Roberts,* 14 *Howard* 472; 7 *Eng.* 822.

In the last case, a tax deed reciting an assessment for taxes which remained unpaid, the advertisement of the land, and offering it for sale, its being struck down to the highest bidder, who paid the purchase money and received a certificate, held sufficient under the above statute, making such deeds evidence; by comparison, it will be found that the recitals of the deed in this case are fuller, if possible, than those in the deed men-

tioned in the case of *Pillow vs. Roberts. Hutt vs. Fenno*, 15 *Ark*. 331.

From the above decisions, and the legislation upon the subject of tax titles, we lay it down broadly, that a tax deed showing that the land was assessed; that the taxes were not paid, and that it was sold on the day given by law for that purpose, and the purchase, with proper words of grant, is sufficient in law and *equity*, without regard to the form and nature of the proceedings, to throw the burden of proof upon the objector to a confirmation, or other party to a suit of ejectment.

We assume that the *status* of property and person in reference to the revenue, is fixed on the first day of January in each year; and that if a person becomes a resident after that day, and brings into the county personal property, it is not subject to assessment for taxes.

We assume the position, under the provisions of the law, that when the assessor returned his assessment roll, it became a public record; parties whose names were on the tax book then had a day in court, to-wit: the first term of the county court after the 25th of March: aside from actual notice which is given, every one is bound to know the law, and when the law fixes a time for holding regular terms of a court, persons must know the time it fixes; the County Court then proceeds to correct it, as to amount, value and list in which the tax-payer is placed; if a resident is placed on the non-resident list, he is entitled to have it *adjusted and corrected*.

When the County Court passes upon a tax book, it becomes a judicial act, entitled to full faith and credit as such, and not to be questioned collaterally; being a judgment of a superior court. *Borden vs. State*, 6 *Eng*. 519; *Evans vs. Black & Percifield, ub. sup.; United States vs. Nourse*, 9 *Peter's S. C. Rep*. 8; *Comfranc vs. Dufour*, 11 *Mar. La. Rep*. 604.

We further contend that the tax book being so made out and delivered to the collector, who, for this purpose, has no connection with the assessor, with the amount of taxable property and taxes, with its list of resident and non-resident tax payers; it

is his authority, which he has no more power to alter than he would have to alter the face of an execution. If he finds property on his tax book on the non-resident list, he is bound to sell it as such, though he may know him to be a resident. This proposition is too palpable to need argument. The assessment is the finding of the debt, the action of the County Court is the judgment, and the tax book and warrant is the execution.

The seventh objection, that McFadgen tendered the *taxes* prior to the sale, is insufficient, because he does not show that he made such tender before the advertising of the land, when a penalty of twenty-five per cent. and costs were due under the 95*th section of the* 139*th chapter Digest* and if he did not tender the whole, it is no tender; the evidence shows that this pretended tender was made on the day of sale in Tennessee paper, accompanied with an express refusal to pay the penalty and cost.

To the objection that the land was twice sold, we answer, that in case of failure to pay the bid, the collector has power to re-sell; see *sec.* 101, 102, *chap.* 139, *Dig.*, made in reference to auditor's sale. Yet the collector has a power, independent of any statute, to sell again if the taxes are not paid on the first bid; this is absolutely necessary, and the only fetter upon him is, perhaps, confining him to the same day, and aside from the question that there is no proof of identity of the person, in this case Hunt was not precluded from bidding at the second sale, and it will require more than the mere fact of forfeiting his first bid, and buying at a second sale to make out a case of fraud, which will not be presumed, and must be clearly made out by proof, and even circumstances of suspicion will not be sufficient, *Trenchard vs. Wanley,* 2 *P. Will.* 166; *Townsend vs. Lowfield,* 1 *Ves.* 35; 3 *Atk.* 534; *Walker vs. Symonds,* 3 *Swanst. Rep.* 61; *Muddox Ch. Pr.* 208; 1 *Story's Eq. Jur.* 200.

JORDAN and WATKINS & GALLAGHER, for the appellee.

If the real estate of a *resident* of the county is assessed as a *non-resident,* while he is actually *residing in the county as a bona*

*fide citizen*, the sale made upon such assessment is absolutely void; and the assessment being the foundation of the judgment, warrant, or authority to sell, if it be illegal, all the subsequent proceedings are null and void. *Blackwell on Tax Titles,* 168, 169, 170, 171, 172 *and* 173; *Barker vs. Hesseltine,* 27 *Maine R.* 354; *Brown vs. Veazie,* 25 *Maine* 359; *Lunt vs. Wormell,* 19 *Maine R.* 100; *Wallace vs. Scott,* 7 *Watts & Serg.* 248; *Wilson vs. Watterson,* 4 *Barr* 214; *Milliken vs. Benedict,* 8 *Barr* 169; 6 *Watts* 503; 2 *Watts* 420, 124; 5 *Watts* 441, 382; 9 *Watts* 104.

The power of the assessor is limited and special. The regulations of the statute are imperative. They are made for the benefit of the owner—and unless strictly pursued, no valid title can be acquired at tax sale. *Blackwell* 140, 148, 149 *and* 150; *Lessee of Hughcy vs. Harrell et al.,* 2 *Ham. R.* 231; 4 *Ohio Cond. Rep.* 335; *Saunders vs. Springteen,* 4 *Wend.* 429; *Tollman vs. White,* 2 *Comst. R.* 66; *Lessee of Perkins vs. Dribble,* 10 *Ohio R.*

No valid sale can be made of the lands of a resident of the county until after *demand* is made for the taxes due. *Blackwell* 265, 216, 211 *and* 212; *Thompson vs. Gardner,* 10 *J. R.* 404; *Beach vs. Vandenburg,* 10 *J. R.* 360; *Johnson vs. McIntosh,* 1 *Bibb.* 295; *Bott vs. Pearly,* 11 *Mass.* 169; 4 *McLean R.* 213; *Blackwell* 487, *and notes.*

We have not been able, after a thorough search, to find any decision, to the effect that, to avoid the consequences of an illegal assessment, a party is bound to appeal to the County Court, or, by failing to take an appeal, he loses his remedy. But, on the contrary, the doctrine is well established, that in order to deprive the owner of his title, the purchaser at a tax sale must show, affirmatively, that all the essential pre-requisites of the law have been fully complied with. *Blackwell on Tax Titles* 47.

The title of a purchaser under a tax sale is a *legal title.* If the title has not accrued in the form prescribed by law, the deed is void, and equity, as a general rule, cannot aid it. *Young vs.*

18

*Keogh*, 11 *Illinois* 642; *Young vs. Dowling*, 15 *Ill.* 481; *Black-well on Tax Titles* 577.

The only remedy available to this defendant is *ejectment*: (*Kelly vs. Hunter*, 12 *Ohio* 216;) because the petition does not aver possession of the land, either actual or constructive; and it is shown that defendant was, at the time of sale, has ever been since, and is now, in possession of the land. We hold the true policy and meaning of the statute to be, that the petitioner seeking a confirmation, must have actual possession of the land, or constructive possession; *i. e.*, there must be no actual adverse possession. See 3 *Halstead R.* 324.

The statute, by express terms, restricts this form of proceeding to those purchasers, etc., *in possession.*

SEC. 1. The purchasers, etc., may protect themselves from *eviction*, etc.—or from any responsibility as *possessors of the same*, etc., by pursuing the rules, hereinafter prescribed, etc.

SEC. 2. Prescribes that the notice is to declare the nature of the title by which the land " *is held.*"

SEC. 6. Prescribes that the decree of confirmation shall operate as a complete *bar* against any person claiming said land in consequence of informality, etc.

Does not this show that the decree was never contemplated as being made against one *in possession?*

There is one feature in this case, which, even admitting all other objections to be of no avail, must be deemed conclusive of it in favor of the defendant below. The certified copy of the record of the sales from the auditor's office, shows that there were *two sales* of these identical lands. At the first sale, Hunt (the petitioner) purchased *a portion*, say 90 acres of these lands, for the taxes, etc., due on the whole 360 acres. He afterwards forfeited his bids, and after the sale proper was concluded, a second sale was held, and he purchased the *whole of the lands* for the taxes, etc. If a transaction of this sort is not a positive fraud, it is certainly an act on the part of the purchaser which the Court will hold to be a constructive fraud on the owner of the land. The petitioner does not claim in this pro-

ceeding, anything under his *first* purchase, he having forfeited that; and he ought not, certainly, under his *second* purchase, derive any benefit in the face of such an act and under such circumstance. See, as to fraudulent purchases at tax sales, *Blackwell on Tax Titles, chap.* 24.

Let the Court establish the precedent of the right of a purchaser of land for a small portion of them to forfeit his bid at the regular sale; and then, when a less or no competition, at a second sale, probably after the time of sale has passed, come in and buy the whole lands for the taxes, the whole matter of tax sale will, and ought to become a reproach to the State, as being a proceeding sanctioning the most glaring frauds against absent owners of lands, who, in most cases, have no notice of these sales, or of proceedings for confirmation.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

This was a petition for confirmation of tax title, filed in the Prairie Circuit Court, by the appellant, James L. Hunt.

The appellant sought confirmation of title to five tracts of land, embracing 360 acres, purchased by him, on the first Monday of November, 1851, at a tax sale made by the collector of Prairie county, as the property of McFadgen, in whose name the lands were assessed and sold as a non-resident, etc.

McFadgen appeared, and, by leave of the Court, interposed a number of objections to the confirmation; and, on the final hearing, the prayer of the petitioner was refused, and he appealed.

The *first* objection to the confirmation, that the petition was not sworn to, is not true in point of fact.

The *second* objection, that two other persons were equally interested with Hunt in the title to the lands, and should have been made parties to the petition, is not sustained by the proof, nor is the objection insisted upon in the argument of the counsel for the appellee.

The 3d, 4th, 5th, 6th, 9th and 10th objections are founded upon the same grounds, and may be disposed of together.

They are, in substance, that McFadgen was a resident, and not a non-resident, of Prairie county, at the time the lands in question were assessed for taxes, in the year 1851, and resided upon the lands, and continued there to reside until the sale thereof, etc.; which was known to the assessor and collector, etc. That he had in his possession sufficient personal property to pay the taxes, etc., charged upon the lands, etc. That the assessor did not call upon him for a list of his lands, etc, for taxation, etc.; and that the collector made no demand of the taxes, etc., before proceeding to sell the lands, etc.

It appears that the lands were assessed to McFadgen as a non-resident of Prairie county, and that the collector proceeded to sell them as the lands of a non-resident.

The objections under consideration present the issue that he was not a non-resident at the time the lands were assessed, etc., but a resident of the county, and insist, as a consequence, that he should have been assessed as such, and that the collector should have made a demand of the taxes, and proceeded against his personal property before resorting to the lands, according to the provisions of the statute for the collection of taxes assessed to resident land-holders, etc.

The collector's deed exhibited with the petition for confirmation, not appearing upon its face to be void, and reciting that McFadgen was a non-resident of Prairie county at the time the lands in controversy were assessed to him for the year 1851, the deed must be regarded as *prima facie* evidence of that fact, and the burthen of proving that he was not a non-resident, but a resident at the time the lands were assessed, is upon Mc-Fadgen.   *Dig., chap.* 148, *secs.* 129, 130, *etc.; Ib., chap.* 170, *sec.* 5; *Parker vs. Overman,* 18 *Howard U. S.* 137; *Patrick vs. Davis,* 15 *Ark.* 363; *Merrick et al. vs. Hutt, Ib.* 331; *Pillow vs. Roberts,* 13 *How.* 472; *S. C.,* 7 *Eng.* 822; *Gossett et al. vs. Kent et al.,* 19 *Ark.* 692; *Hogins vs. Brashears,* 13 *Ib.* 242; *Bonnell vs. Roane,* (*present Term*).

*Barksdale,* the officer who assessed and sold the lands, deposes that the Auditor sent him a list of lands belonging to non-

residents, and subject to assessment for the year 1851, which included the lands of McFadgen as a non-resident, etc. That at the time he so assessed the lands he believed McFadgen to be a non-resident; that he knew of no person in the county of that name, etc. He was not asked by the counsel for either of the parties, upon his examination, and did not state, the day or month in which he so assessed the lands in question.

The testimony of the witnesses conduced to prove that McFadgen moved into Prairie county, and settled on the lands in controversy, at some time between the middle of January and the first of February, 1851. One witness, who lived near him, deposed that he saw him on the next day after he moved in, and that it was the last of January or first of February. The testimony of the other witnesses is not so definite as to the time he became a resident.

There is testimony conducing to prove, also, that the assessor was in McFadgen's neighborhood in February or March, making some assessments, and was at that time informed, perhaps, that McFadgen had moved in.

The assessor seems to have labored under the erroneous impression that the personal property of McFadgen was not subject to assessment, because he was not a resident of the county on the *first* day of January. But the proof in the cause fails to show that he was not a non-resident at the time the lands were assessed to him by the assessor as such, and consequently the evidence afforded by the collector's deed is not overturned as to this point.

The *seventh* objection to the confirmation is, that McFadgen, as alleged, offered to pay the taxes due on the lands prior to the sale, and that the collector refused to receive the money.

The proof on this point conduces to show that on the day the lands were sold, and prior to the sale, an agent of McFadgen offered to pay the taxes charged upon the lands in Tennessee Bank paper, which the collector declined to accept, because the agent would not also agree to pay the penalty cost of advertising, etc., etc., charged upon the lands.

The collector, acting in discharge of a public duty, had no legal right to receive Tennessee Bank paper in payment of taxes. The law prohibits him from receiving any thing but current money of the United States or Treasury warrants of this State (*Gould's Dig.*, chap. 148, sec. 69), or notes of the State Bank, issued prior to the 10th January, 1845. *Danley vs. Pike*, 15 *Ark.* 141; 10 *How. U. S. R.* 203. Moreover, only a part of the sum charged upon the lands was tendered. To make the tender effectual to stop the sale of the lands, the whole of the taxes, penalty and costs should have been tendered. *Parsons on Cont.* 151, etc.

The eighth objection is that Hunt bid off the lands at the regular sale, agreeing to pay the taxes, etc., upon them, for 93 acres; that he refused to comply with his bid, and thereby caused the lands to be offered for sale again, after the usual sale hours, and became the purchaser of the whole of them for the taxes, etc., which was a fraud upon the rights of McFadgen, etc.

A transcript of the record of the sale, kept by the Clerk of the County Court, is made an exhibit to the petition for confirmation, and was read by the appellee upon the hearing of the cause. From this it appears that the lands of the appellee were offered for sale, by separate tracts, for the taxes, etc., due upon each; and that Hunt became the purchaser on the terms following:

1. He bid off the whole of the first tract, being the S. E ¼ of the S. E. ¼ of section 12, township 3 north, range 5 west, forty acres, for the taxes, etc., due thereon, etc.

2. He agreed to pay the taxes, etc., on the second tract, of 80 acres, for 40 acres thereof.

3. On the third tract, of 80 acres, for five acres.

4. On the fourth tract, of 80 acres, for five acres: and

5. On the fifth tract, of 80 acres, for three acres, etc.

The transcript of the record further shows that Hunt " refused to pay up the taxes," etc., charged upon the lands in accordance with his bids, and that the lands were offered for

sale again, by the collector, " *on the evening* of the same day," and that Hunt purchased the whole of each of the five tracts for the taxes, etc.

It may be reasonably inferred from the above facts that at the first and regular sale of the lands, there were competing bidders with Hunt for each of the five tracts of land except the *first*, because he agreed to pay the taxes upon the *second* tract for one half of it, and upon the other three tracts for but a few acres of each, which he would hardly have done without competition. It may also be reasonably concluded that there were no competing bidders at the second sale in the *evening*, inasmuch as Hunt purchased the whole of the lands for the taxes— the five tracts embracing 360 acres, for the aggregate sum of $9 72.

It follows that the failure of Hunt to comply with the bid for the first tract of land, at the first sale, worked no injury to McFadgen, because he purchased the entire tract at the first, as well as the last sale for the taxes, etc. But his failure to comply with his bids upon the other four tracts, at the first sale, produced a second sale of the tracts, which resulted greatly to the prejudice of McFadgen, and to the advantage of Hunt, and which cannot be regarded otherwise than a fraud upon the rights of the former. Upon the facts of the case, we think that Hunt has no just claim to come into a Court of equity and demand a confirmation of his title to the four tracts of land thus purchased by him at the second sale. His conduct in refusing to make payment upon his bids at the first sale, is treated by the law as penal (*Dig., chap.* 108, *sec.* 121); and for a court of equity to sanction and confirm such of his purchases at the second sale as were prejudicial to the owner of the lands, would be to aid him in taking advantage of his own wrong, and open a wide door for the perpetration of unfairness and fraud at tax sales.

The result is that the decree of the Court below must be affirmed as to all of the tracts of land in controversy, except

the first, above described, and as to it the decree must be reversed, and a decree entered here, and certified to the Court below confirming the title of the appellant.

Mr. Justice RECTOR, dissenting.

I have not arrived at the conclusion attained by my brother judges in this case.

The facts material to be noticed are, that the lands of McFadgen were assessed in Prairie county, as non-resident lands. That subsequently the owner became a resident, and within the *knowledge* of the collector, as early as the month of February, and so continued during the year, and up to the time of sale. That no demand was made, nor effort of any sort to collect the taxes charged, but that the lands were proceeded against and sold.

That Hunt bid off the first tract for the taxes due thereon, but having competition only secured a few acres in each of the remaining tracts; and refused to pay his bids for any. That in the afternoon, on the same day, the collector offered the lands again, when Hunt succeeded in bidding off all the tracts, without any diminution in the number of acres.

The opinion of a majority of the Court is, first, that the lands being assessed upon the non-resident list, the proceeding is and must continue as one *in rem*, and cannot be changed by the subsequent residence of the owner, to one *in personam*.

This principle, I am aware, is distinctly held by this Court, in the case of *Gossett et al. vs. Kent et al.*, and is possibly the better exposition of the Statute, but of this I confess myself to entertain very serious doubts. But conceding that point fully, I think the conduct of Hunt clearly portrays a fraudulent intent, and for this reason, is entitled to no consideration from a court of equity, neither as to the first tract, nor the others.

It is said that "*intent and injury*" must concur to constitute fraud. And, in the opinion of the Court, Hunt having obtained the whole of the first tract bid off at the sale held in the morning, and having done no more in the afternoon, McFadgen

suffered no injury, and therefore the purchase as to that tract is valid.

Hunt's intention from the beginning was to drive off competition by underbidding—refusing to pay—and, at a second sale in the afternoon, to drive a better bargain; which he did, if a court of chancery will aid him in perfecting his title. The *intent* is apparent—the *injury* is, in buying McFadgen's lands, under that intent, and seeking to hold them.

I think him entitled to none of the lands, and that the Court below was right in refusing him confirmation.